Page number 22-5238 et al. Maine Lobstermen's Association, Atalant, State of Maine Department of Marine Resources et al. versus National Marine Fisheries Service et al. Mr. Clements for the Atalant Maine Lobstermen's Association, Ms. Engel for the Appalachian National Marine Fisheries Service et al., Ms. Montel for the Intervenor Appalachian Conservation Group. Mr. Clements, good morning. Good morning, your honor, and may it please the court, Paul Clement, the Atalant. Properly construed, the Endangered Species Act not required the federal government to shutter an iconic industry central to the cultural identity of Maine to avoid speculative harms to an endangered species. The federal government's approach of protecting species against worst case scenarios without considering the countervailing costs for other important objections perkins back to the pre-TBA Hill approach to the Endangered Species Act that Congress amended the ESA to address. And as amended, the ESA requires the federal government to consider likely scenarios and make decisions based on the best available scientific and commercial data, not based on speculation, presumptions, and worst case scenarios. Could the agency, could the reviewing agency adopt a tie goes to the species rule? I don't think so, your honor, and the reason I don't think they could adopt that rule properly is because if you adopt that kind of substantive presumption that the tie goes to the species, then I'm afraid the agency is going to find ties everywhere. I mean, I really think what the statute tells them to do is to take the best available scientific and commercial data and take it where it leads. And I think anything that puts a thumb on the scale or considers worst case scenarios or even breaks ties is going to take them away from the mission that Congress gave them with that direction to use the best available scientific and commercial data. And I think in a sense this biological opinion is an example of why what seems like it might be, it might sound reasonable, no, I mean everything you can, and then like, you know, at the last stage, you know, kind of like Chevron, you exhausted every other statutory tool in the toolbox, and then only then can you use like Chevron or Lenity or any doctrine like that where like you shouldn't get to the tie too quickly, but gosh, I don't know. I mean, isn't this a question of degree? I mean, this opinion sounds a little extreme because of the extent of the thumb. Right, but I don't know why, I mean, you know, if it really were a 50-50 question, you know, it might be 100, it might be 80, and they say 80 is better for the species. It doesn't seem unreasonable. Here's the reason, you know, even if it seems reasonable, it's not consistent with the statute, and here's why ultimately it's not even reasonable, which is, the way this works in practice is this is not like, like, there's one, you know, there's one datum, and, you know, and you just have to make a judgment based on that one datum. This is like a formula that considers multiple factors and then factors after factors. So if in every stage of the process, as is the case here, you break the tie in favor of the species, then when you multiply all of those high-breaking results, you end up with a biological opinion like this, where the agency itself says this is likely to radically, you know, I didn't say radically, but they admit that it's likely to overestimate the impact, you know, that it's going to have on the species, and so I think that's why what sounds innocuous in theory is not innocuous in practice, and it creates the distortions that you see here, and it's not consistent with the statutory text. It's not consistent with the regulatory text. I mean, you know, one of the reasons why I don't think the agency has expressly asked for Chevron deference here is they have a bigger problem under the regulations than they do under the statutory language, because the statutory language talks about what's likely. The regulatory language talks about what's reasonably certain. They are supposed to be taking into account things that are reasonably certain, and that's an even bigger problem. Well, Mr. Cohen, suppose there's just no data at one of these stages in the analysis. Let's say there's just no data on what are they supposed to do. I think at that point, they are supposed to do the best job they can based on the available scientific and commercially available data. Let's say that on this example, there's no data on mortality in Canada. It defies common sense to think that no whale ever dies in Canada. Right. The country would be overrun with whales if Canada did. So what are they to do? So they're to do something. Sure. And what they have to do, in my view, is they have to take whatever data they have. So they have no data in Canada. I'm taking your assumption. There's no data from Canada. But they have some data from the United States. So then they take the data from the United States, and they make reasonable assumptions about what would be different in Canada. And, you know, if they have some additional survey that says, well, the water gets 10 degrees cooler, then something different happens, they can take that into account. But they can't take it to drop the data from the U.S. They have no data on either side. But there are conditions that differ from one place to the other, and no data. Well, I think if there's no data at all, I would say that there's nothing that's particularly likely, nothing that's reasonably certain. But I think in every practical situation that arises, there's going to be some data somewhere that they can extrapolate from. But there's a big difference if you extrapolate with a thumb on the scale, and it's just extrapolate your sort of best effort to get to the right result. And if I could just try to give you a concrete example of kind of where this infected the analysis, if you have the Joint Appendix on page 814, this is page 216 of the Bioblast Blockade. And if you keep in mind that the whole reason we're here is because of the unusual mortality event in 2017. Because the lobster fishery is authorized up to this point under restrictions that are things that the lobster industry can accommodate. The lobster industry is not interested in harming the right whale. They've taken a lot of efforts, including ones that are economically counterproductive, to get themselves in a position where they're compliant with the prior regime. So what gets us here and causes the agencies to reconsider things, and perhaps impose new restrictions, is the mortality events in 2017. And what page are you at? I'm at page 814 of the Joint Appendix, page 216 of the Bioblast Blockade. Okay, that's good. And there's this chart, which I think helpfully illustrates kind of who's responsible for the event of why we're here. Which I'm not suggesting that's the sum total of the analysis. But when you're trying to make a likely judgment about real-world scenarios, if you look at this chart, and it's talking about the confirmed entanglements and the ones that have led to fatalities, if you look at the confirmed U.S. column, it is essentially a straight line from 2010 to 2018. And there's about one a year. And in the years 2017, 2018, or 2016 to 2018, which might be the most relevant years for the unusual mortality event that has us all here and has changed the regulatory approach, there's one each year, and none of them involve serious injury or mortality. On the other hand, if you look at the confirmed Canada column, it is clear that they went from zero to one for every year to having a real problem with multiple entanglements every year, as many as eight in 2017. And, you know, essentially all of the problem that has us here is a problem that is a Canadian problem. But if you look just a little bit further down on that same page in the first paragraph under the column, you will see that what the agency did there is it basically discarded that data because it thought that there was some better data on scarring analysis in a different data set. And then it said, in explaining why it didn't ultimately rest on this data, it said, the approach provides the benefit of death to the species in a more conservative estimate of total right whale entanglement. Well, you bet it does. But it obscures the basic fact here that the unusual mortality event that has us all here today is a phenomenon that the best available scientific and commercial data make pretty clear is happening in Canada because of the snow crab fisheries, and it's because the climate changes and the like have caused the migration patterns to mean that there are more whales coming into contact with vessels and fishery equipment in Canada. And, you know, and so this, to me, that's just like a dramatic illustration that what seems like a relatively innocuous sort of tie-breaking rule ends up in practice causing the agency to simply ignore some of the best available and scientific data. And part of the reason we focus on this, I mean, you know... Mr. Clement, are these arguments, in your view, going to the reasonableness of what the agency did or going to the fact that the agency acted contrary to law? Because I think it is really important to disentangle which arguments go to which part of that analysis. Yeah, and thank you, Judge Brown. I was actually just explaining that, you know, these arguments that I've just been making, I think do go to the statutory authority and the statutory error. And I was about to explain that, in fact, you know, what I was just showing you is an illustration of one of the manifestations of the error. And my co-appellants have, you know, drilled down at, you know, a level and said some of these things are reasonable. We made a conscious effort in our brief to focus on  that we think fundamentally skewed the analysis. And that is the sort of the thumb on the scale, the worst case scenarios, instead of the best available scientific data. And what I haven't had a chance to talk about yet, but it's also this phenomenon where a consulting agency has effectively rebaked all of the draconian restrictions just into the proposal. Before you get to your Q2, just on that point from Judge Rao, is it fair to say that your Q1 framing this as a threshold legal question is sort of the sum total of all of the individual errors, back-end manifestations of this plus this plus this could make the thing arbitrary, could make the decision arbitrary? Yes. I mean, what I would say is this happens to be a statutory error at the threshold, essentially, that then manifests itself in a number of errors that you could say are- Even if we wouldn't necessarily find that any one of the decisions on the back-end was itself arbitrary. Yes. I might quibble and say that at that point, the APA problem is contrary to law, as opposed to arbitrary and capricious. I think this is, I fully embrace the arguments the State of Maine and the other interveners have made, that this is arbitrary and capricious as a bonus, but I also think it's just contrary to law across the board. And of course, it should frighten nobody that if you deviate from the mission that Congress has given you, you're going to produce results that look arbitrary and capricious as well. This is all about the biological opinion. But as I understand your claims of standing here, it rests on the take reduction, right? No. We think our claims of standing, we challenge biological opinion, the conservation framework, and the rule. Okay. Well, what provides you with a standing? Authoring. How does the biological opinion bearing injuring you? It is injuring us because it is effectively conditioning the authorization of the fishery under a view of the Endangered Species Act that necessarily results in draft funding restrictions being imposed. Ones that have already been imposed? Yes, in part. So you are challenging the trade, the would like, in other words, you would like the existing rule vacated. Well, I think we would like it sort of invalidated, but not vacated, you know, or remain without fully vacating it. Because, I mean, you know, I think there's at least an argument, and maybe it's different after the Intervening Appropriations Act, but, you know, we can't operate the fishery unless we have a biological opinion in place. And so that's why throughout this litigation, we have asked for, you know, a remand without vacature, because it's, you know, and maybe it's different. Why doesn't it contradict? First of all, why doesn't the Appropriations Act give you what you need? Well, it doesn't give us, I mean, there's two things. And one, it may give us what we need in the sense that we may not need a biological opinion in light of the Appropriations Act, but we are still suffering continued injury from the conservation framework. Oh. Because, you know, I would actually ask- The framework is all about things to come, isn't it? No, and I think that's a critical sort of, the conservation framework has four parts. And the first part of it is the rule. And then the second part is a gill net proposal. And then the third part is something they were planning on doing. So now the second part they've abandoned, right? Well, I mean, I don't mean to be pedantic, but it's the third part they've abandoned, because the second part is with gill nets and that's not really affected by- So the third part. The third part they said they've abandoned, but here's what they haven't abandoned. They haven't vacated the conservation framework and their own declaration in support of non-mootness says that they will continue to use the conservation framework for non-regulatory action. What does that mean? Well, I think they are seriously vague, but they do give us some examples. And now I'm reading from the last, the penultimate page of their declaration in support of mootness. This is the Antony Declaration. And the examples of the non- and I'm literally quoting a quote, examples of non-regulatory actions described in the conservation framework include providing updates as appropriate on the implementation of the framework to various third parties. I don't know how you say you've abandoned the framework or it's no longer an operative document when you're giving regulated parties updates on the implementation of the framework. And then the next thing they say, and this really gets to the point of continuing entry. And whether you thought this would be sufficient if we were coming in today, initially with our challenge is obviously a separate question of whether we suffer the kind of continuing entry that avoids mootness. And on that, they say that they will be updating any available data to assess, and again, I'm quoting, to assess progress towards achieving the conservation framework goals. Well, the stated goal of the conservation framework in 2030, which is after the appropriations rider sort of pause expires, is to get us down to a take level of 10.136, which- That's what you just read though. It's all about things that they're going to do in the future, right? It's what they're doing now. They're assessing data on a day-to-day basis based on- How does their assessment of the data then today affect? It affects us in the sense that we have ongoing, there are ongoing meetings in the take reduction team meetings that are mandatory meetings, and they're all being done with an eye towards ensuring there's compliance with the fishery with both the ESA and the Marine Mammal Protection. And doesn't the act give you that, the appropriations? No, no. You're using compliance. We're in compliance until 2028, but we still have to have ongoing meetings. We have to figure out what's going to happen in 2029 and 2030. And they are telling us that right now, they are evaluating the current data in light of the goals in the conservation framework, which for 2030 are a wholly unrealistic 1.36. And their goal is based on all of this bad science and all of this bad data. Now, to be clear, that's all to me, fully sufficient to satisfy the standard for continuing effect to avoid movements. And the West Virginia EPA case obviously speaks directly to that, but we're also suffering injury right now from the rule. There's no doubt, no doubt in my mind, you have a live challenge to phase one, the rule. And based on that challenge, we can look at the biological opinion to the extent it supports them. Right. But I guess I'm a lot more skeptical about, I had thought the framework consists of the rule, which fine, you have your challenge. And then phases three and four, which are high in the sky might happen in the future. And Congress has now said, aren't going to happen. You're in compliance with phase three and four. I would urge you to take another look at our declarations for the expedition motion. Now, obviously they weren't written with an eye towards the intervening Congressional Act, but they made clear that the industry, as one would expect, like they have to today try to make investments to decide whether to buy another boat, buy more traps, all with an eye towards what's the regulatory environment going forward. And what the declaration shows is to a moral certainty that the agency is sticking by its guns and the goals as set up in the biological opinion in the conservation framework. And like, we just can't... We don't know how that's going to manifest itself in future regulations. It seems like a pretty bad prudential ripeness problem if we're going to try to guess, not at phase one, which is on the books, Harmony, when we look at that, but future agency action. So I don't... It's not my burden to convince you that I'm in this case the hard way and the easy way. And you've already told me that you think that... I'm going to put their different actions under review and we have a clean shot at one of them, but I'm skeptical about the rest of it. Well, then let me address your skepticism head on because the question here is not what... Like, I just don't think you get the prudential ripeness the way you would if you walked into court today and said, I'm going to show you I have article three standing to challenge the biological opinion in the conservation framework. The question that is relevant for movements... And again, the other cases, late law, other cases that we cite in our opposition make this clear. But I also think since the West Virginia case is recent in a lot of people's minds, it makes this very clear that the standard is different when you're at movements. And the burden shifts to the government. The government has to show that there's no possibility that the injury doesn't linger. And here, not only have they not carried their burden, they've actually essentially let themselves out of that burden by saying they're going to continue to use the biological opinions for non-regulatory action. Mr. Cormier, I guess I have a question. Why are you not seeking a vacator of the biological opinion? I mean, if we were to agree with you on the first question, would it be open to us to vacate the biological opinion and not the final rule? So the short answer is, I think it is debatable, but I think the better view is that after the appropriations record, it is open to you to vacate the biological opinion. Why are you not seeking that? Well, I mean, the reason I'm not seeking that is principally an historical artifact of the fact that up until the point that the appropriations record came into play, so throughout all of the district court proceedings, we affirmatively asked, and every brief we filed in this court up until the witness response, we were very clear that we were asking for essentially re-ending that vacature. Because she needed the biological opinion. Because we needed the biological opinion to operate the fishery. I think the best reason- Do you need the opinion to operate the fishery or the final rule, or are they inextricably connected in a way that you need both in order to operate the fishery? So, I think that the best answer to that is what we absolutely need is biological opinion. I think the agency in this case has sort of tied them together in a way that's not our fault and really didn't matter at all until the appropriations were higher. But the biological opinion is an evaluation of the conservation framework, the first piece of which is the rule. So, in the removal of this paper, they try to kind of disentangle them in ways that I just don't think work given the history of this case. But just to be as clear as I can, for purpose until the appropriations act, it was our considerate and I think absolutely correct view that we needed the biological opinion to operate the fishery. So, we didn't want to get a vacature as biological opinion. Now, that's just- And if that's not true, is that still true after the act? I think the better view is no. Just to say, I think it's not true. I think my reading of the act says that we have sort of a sufficient basis to operate under the final rule. That's sufficient. I don't think it says necessary, which is why I do think, and just to be clear about that and clear about the continuing injury that we suffer. As part of our own efforts to try to be responsible and our own concerns about the right whale, we don't have a particular objection to a lot of what's in the final rule in terms of gear marking and things that we think will ultimately just make it more obvious that we are not the source of the problem. But one of the things the final rule did, kind of threw in as a relatively unanalyzed bonus is to have an offshore closure of the whole parts of the Gulf of Maine. Talk about irreparable injury. My clients can't go there because of that aspect of the rule. I think one way we could get relief here is putting it aside for a second exactly how you stylize it and whether it's a remand without vacature or it's a vacature in the biological opinion but only because of the appropriations act. But if one of the things that came out of that is that we ended up with the final rule without the offshore closure, that would have a huge immediate on the ground real world effect that would benefit my client. Can I ask you, I have some other questions about the merits of Q2 but as to remedy for your second question about the conservation framework, I mean, if we were to find that the agencies acted ultra-zero by imposing the conservation framework in the way that it was imposed, would that be a basis for vacating the conservation framework? I think it would be is the short answer. So yes, I don't know if we're complicated. Yes. And what is it that you would need in order to re-enter the now off-limits zone? We cannot enter the off-limits zone with the current final rule in place. And if I could say, I mean, I know it's over time, but I'd like to say a few words on the merits of Q2 because I mentioned you had questions. We'll let you do that. But if we remand without vacating, that restriction is still in place, no? It is, but my sort of understanding is there are different ways to sort of remand without vacating. And if there's a remand with a, you know, essentially a requirement that they do the math over or a strong suggestion that they modify the rule in order to come into compliance, you know, I think they might let you. But again, our order would do that. No, if you vacate the final rule or vacate the final rule in part, it could, but I think that just gets, you know, that's, again, it's a little bit complicated because the Appropriation Act comes in very late in the litigation and I don't think it moves anything. But it does, you know, maybe change the battlefield in terms of what precise relief would be most appropriate. And, you know, I don't want to anticipate in everything my friends would make, but, you know, since they seem to think that, you know, sufficient means necessary, they would probably say we can't vacate the final rule because that's necessary for compliance under the Appropriations Act. That's not how I read it. I read it as sufficient means sufficient. And so if the agency ultimately came back and said, all right, you know, all you need is the final rule without the offshore closure and that's all that is necessary for compliance with the ESA and the MMPA, we think it would be valid under that and the statute would provide, essentially in our views, the statute provides a ceiling, but it doesn't provide a floor. Unless there are other questions on that, why don't you go to the merits of Q2? Sure. On Q2, you know, I really do think that this is a pretty serious evasion of the basic structure of the ESA and how it's supposed to work, which is, I think, the way the Act is supposed to work and consistent with the amendments and virtually all the provisions we're talking about here were amended after TVA against Hill to prevent sort of a replication of the Esopho-Teleco Dam in a way that doesn't make economic sense to most people who are observing it. And so these provisions are basically designed to ensure that there's a place where you take into account the countervailing effects of the action, even in a case where there's some jeopardy or some incident will take. And if you allow the consulting agency, not the action agency, because I don't think the action agency can do it either, but if you allow the consultant agency here, as is conceded to be the case, to come in and essentially say on the front end, look, before you run this through the process, that is supposed to get you to cost benefit analysis to a degree, you got to impose all these draconian restrictions on the fishery, and then we'll run that through the process and we'll get a no jeopardy finding and we'll even not make an incidental case finding, which of course gets complicated because that gets challenged by my friends on the other side below as not consistent with either the ESA or the MMPA. But my point is- Mr. Cliff, the question I have about this is, even if we accept your argument that what they did here is in real tension with the ESA and the way it's supposed to work with action agencies and the consulting agencies, surely under the ESA, there's some informal consultation that goes on, right? Between action agencies and the consulting services. So where would we draw a line between what might be a legitimate kind of back and forth that seems to be envisioned by the statute and the regulations and a situation such as this where you are saying, they've gone really too far in imposing these regulatory requirements. So two things, Your Honor. One is, I think the bright line rule at a minimum is the consulting agency can't do it. So if the action agency wants to sort of, you know, kind of talk to the consulting agency informally and then make their formal proposal, that seems to be different from a situation like this where, you know, essentially the proposal gets assumed by the consulting agency is really the product of the consulting agency. So that's one just, I think, clear benchmark. But I also think that- But is that really a benchmark if the action agency is sort of coerced into doing that or just sort of adopts it wholesale? Like it can't just be- I mean, I'm not sure if that is a distinction that would necessarily make the action more lawful. Well, I would say that that's something that's clearly ultra-virus. But I would also say that to the extent you're envisioning a circumstance where the action agency is essentially coerced into it, then that would also be a violation of the statutory structure and contrary to law. I think this court should make clear that like, you know, the agencies are supposed to deal with the ESA issues through consultation. And the consultation involves like an actual, like what the agency actually wants to do. And then the consulting agency brings to bear its expertise as to whether that's consistent with the act in a way that ultimately does two critical things in my view. One, it brings cost-benefit analysis to bear in a direct way. But second, it doesn't cut the committee out of the process entirely. I do wonder too though, here whether the action agency itself has the statutory authority to adopt the conservation framework, right? Because the underlying action here is the approval of the fishery, you know, under these fishery management plans and the Magnuson-Stevens Act. I mean, is there anything in those statutes that gives the action agency even the lawful authority to impose the conservation framework? We don't think so. Is this not something that you focused on in your briefing? But I think there are two questions. There's a question about whether the consulting agency can impose these requirements. You make a number of arguments why they cannot under the statute. But I have a question about whether even the action agency here could impose that under the state. I mean, because the action at that state is approval of the fisheries. And actually, you know, I mean, the statutes are actually very detailed about what factors they're allowed to consider in that process. And none of those factors involve, you know, endangered species concerns. So what I would say just now is, I mean, I have an answer at the podium for you, which is I don't think that the action agency has the authority to do that. I also have a defense for why we didn't brief that. And the defense, why we didn't brief that is because the parties agree that it was a consultation agency that did it here. And that seems to me to be kind of one clear problem. But so, but there is a lurking problem. And, you know, and, you know, if you really want us to, we'll be happy to brief it. But, you know, the reason we didn't brief it is because it really isn't presented in this particular case. But I agree with you. The agency does make some arguments that it wasn't the consulting agency that adopted it. I mean, I know you disagree with that, but they do seem to make some arguments in that direction. Well, that's not how I read their brief. I mean, in all candor, maybe they will, you know, they certainly argue that it is, you know, there's a symbiotic relationship or there's back and forth. But I took them to concede and not defend Judge Boasberg's rationale. Judge Boasberg's clear rationale was, you know, that this was the action agency and they can do it. And we, in our opening brief, said he's just wrong about that. It was the consulting agency. And I took their responsive brief to essentially not defend Judge Boasberg's reasoning on that point and concede it. And the only other thing I'd say about this is because, you know, I would imagine that my friends on the other side are going to come up here and they're going to say, well, you know, either something detailed about the fisheries compact that governs the fishery, or they're going to say something about the beginning of the Endangered Species Act that sort of says that every agency has some responsibility to avoid the problems under the ESA. But what I would say, you've got to read, you know, I would say that it is ultravirus and you should read the authority under the organic statute of all the agencies in light of the ESA. And, you know, it is a problem if an action agency takes it on itself to kind of trim its sails because of the ESA and not because of anything that has to do with their organic responsibilities, then it does tend to circumvent the structure of the act. And in particular, it tends to circumvent the Endangered Species Committee because the act envisions a scenario for how to deal with situations where there's just no good way to avoid jeopardy. And that's the committee. And just to finish this last part, like it's kind of really powerful evidence that they evaded the politically responsible committee here that Congress had to intervene. Let me go back to Judge Rao's opening point about, I think, maybe inevitable informality in the exchange between the two peer divisions of the same agency. So the action agency comes in with a proposal and the consulting agency says, look, I can look at this and tell you on its face, it's not going to pass, right? Why don't you just redraw it? Or will we? I mean, there's no point in me putting this through the process. That somehow evades the procedure? I don't think it's all of that. If that's all that happens, I don't think that evades the procedure. And then the action agency says, well, look, what do you think is necessary? But can you give us a hand with this? What should we build in? And if it becomes, I mean, you know, this is why the questions are in a sense related. But, you know, I mean, part of the problem is if, you know, the way the statute, I think, is engaged is the action agency is to a degree supposed to be playing offense. And the consulting agency is supposed to be playing defense. And an informal consultation is great. But if they sort of switch sides, or, you know, just like the action agency essentially capitulates, then, you know, the party that's playing defense has a natural incentive to sort of, you know, look at everything from the perspective of a defense and sort of, you know, even when they're not explicit about it as here, kind of err on the side of the species. And if that, you know, and I think you can write an opinion. It's just, look, informal consultation is fine. But you can't let the consulting agency get to the point that they're taking over the process. And as the action agency, you can't rebate things to the point that you're evading the statute. And the action agency could always come back and say, no, we don't want to do that. If it won't fly, it won't fly. But this is our proposal. They didn't say. I said, instead, give us a hand. Yeah, I mean, I agree. It seems to me you're asking for a paper shuffle to no purpose. I don't think so. Because I think if you make clear that the action agency is not supposed to sort of defensive crouch into his proposal, then you will have a situation where the statute works as intended. And it may, you know, my friends on the other side always say, well, you know, the Endangered Species Committee has only met six times. I would say that's, you know, that's above, not a feature. Because, you know, if you look at the statutory text, most of the words are describing the Endangered Species Committee. And I think Congress amending the statute in light of TBA against Hill expected the Endangered Species Committee to be convened more than six times in the next, you know, what has it been, 45 years or whatever. And I think that, again, I just point you, you know, the forces that cause Congress, which, you know, takes a lot to get over the inertia to intervene here is the fact that you've got, finally got politically responsible people to take a look at this and say, we all appreciate the right whale. We all want to do the right thing by the right whales, but fun's fun. And you don't just take out an entire industry, especially when all signs point to the real problem lying north of the board. And the Canadians, to be clear, are being responsible and trying to do their level best to deal with it too. But my point is, you know, Senator Collins, you know, identified this as the greatest regulatory overreach that she had seen. I think, you know, part of that is some of the things that we pointed to in our briefs and some of the problems that impacted this. But part of it is that the statute was designed to, you know, if there really is a case, and I'm sure my friends on the other side think this, where if you just kind of continue business as usual, jeopardy is just unavoidable. But the statute has a fix for that. At least that's the ESA. It's a little complicated because the MMPA may be a little distinct in this regard, but at least that's the ESA, which is the focal point of the biological opinion. That's the safety valve for the politically accountable process to be brought there. The action agency can go on offense, push as hard as they want to do whatever they want, be adversarial with the reviewing agency and their ultimate trump card is to go to that committee. They don't have to take that posture. They can choose to adopt a more conservative, species-friendly action, right? Maybe not. And this is the ultra-virus point that Drow and I were discussing. I think there's a good argument. Put aside the point about whether there's something in the fishing statutes that would make them authorized. I'm just talking about the dynamic between the action agency and the reviewing agency. Right. And it seems to me what's going on here is the reviewing agency has something akin to a veto power on the back end of a process. And they are leveraging that to try to influence what happens on the front end. But I mean, so what? You know, the president has a veto power with respect to legislation. He says to Congress about a pending bill, don't even think about putting this on my desk. I will veto it, but I will sign a bill, a rewritten bill with the following features. And Congress thinks we're really coerced. We won't be able to override the veto. We'll change the bill, pass what the president wants and he signs it. The president is not acting ultra-virus vis-a-vis Article 1. I agree with that. Okay. Let me say two things First, the clear bright line rule. Whatever else is true, the action agency that's supposed to play offense, even if they want to trim their sales on their own, and there's a question that Judge Brown and I were discussing about whether that's consistent with their organic statute. But at a minimum, they can't hand the keys over to me. And that's what I'm pushing on. I'm not sure. I'm not sure why not. Well, the reviewing agency can exert as much pressure as they want. And the action agency can either pull back and defensively, or they can fight them. They say, no, we want to authorize the fishery. No condition. You go ahead and say, there's no reasonably prudent alternative and we'll fight you before the committee. That's their choice. Just two points, Your Honor. One is that even again, like the one thing they can say, they can hear that they're pushing back. They can do all that. But in the same way that Congress can't just say to the president who threatens the veto power, all right, you just write the legislation and we're not even going to go through bicamerals and present it ourselves. It's just you write the legislation and it becomes law. And so that's why I think we want to keep the people in their lanes. Here's the second thing. This is not a direct analog to sort of the Constitution or Article I and Article II and Article III because here the consulting agency has a veto subject to a veto. And that's the way the statute was designed. And if the action agency just goes, you know, paws up every time just because they view the consulting agency as having the ultimate veto, that's inconsistent with the statutory structure. Because it cuts out and it will not make a plea. Because it doesn't, it doesn't eliminate the option of the action agency to push as hard as they want and fight the reviewing agency before the ultimate authority, which is the politically accountable ESA review committee. With all due respect, if the action agency was explicit and they said, okay, we are going to impose all these rectal restrictions that we don't want, because we just want to get the consulting agency to approve. And they were absolutely explicit about that. I would say that is contrary to law. That is not valid government action. Now, I think what a lot of these questions are going to is the idea that, you know, once you write your opinion, no agency is going to be stupid enough to say it out loud that way. But I still think that there is virtue to signaling that if it were explicit, that is not a proper interpretation of the statute, because it does cut out the committee and it's not functioning. Like, I'm a big believer as a unitary executive as the next guy. But this statute does give different responsibilities to different agencies. And if the one agency basically says, like, we are affirming, we're going to admit that we're not doing our job or we're essentially going to do their job for them on the front end. It does circumvent the statute. It circumvents the cost benefit analysis. It's supposed to happen on the back end. And it essentially makes the Endangered Species Committee a nullity, even though, again, if you look at the statute, if you can't look at that statute and say Congress wanted that Endangered Species Committee to just be the sort of dam in place. I mean, it's most of the relevant statutory language that was added after TVA. And still, those are all the details of how that committee works and the circumstances where Secretary of State can override the committee if there's a treaty violation. And then the national defense people can override the Secretary of State. If there's, I mean, so, so, like, you know, there is, let me give you one number and it's probably the same hypo as straight legislation, but give you a sense where I'm coming from, which is nominations and advice and consent. Senate is on the back end. They can't make the nomination. All they can do is veto the president's nomination, right? Let's say we are very late in a presidential term and there's a Supreme Court vacancy and the Senate says to the president, if you want a nominee, you must pick candidate X, in which case we will move heaven and earth to confirm the nominee, but nobody else. And president says, okay. And nominates that candidate and then they confirm him. So same thing, very coercive, very coercive, not an abuse of the back end veto power to try to leverage what happens on the front end. Same two answers, which is to say one, even conceding all of that, the Senate can't just appoint the, appoint the, the president can't say, all right, you guys, you're holding the cards here. So you disappoint them. I like, forget it. Like you're taking all the fun out of this for me. So you just go appoint the person and you confirm them and take me out of the process entirely because that's what you're trying to do. That would obviously be ultra-violence. But here's the second thing. The second part of the same answer is if you imagine a world where, you know, the system works the way it is, but if there's like, you know, 40 votes against the nominee or something that then it goes to the House and then the House gets to do it. If the Senate were trying to twist the president's arm in a way that was trying to cut the House out of the process, I would think that you, you'd say there's something problematic about that. And maybe it would be hard to police, but you at least want to say as a matter of what is sort of legal and appropriate that the Senate can't about it and say, we're doing something to cut out the House out of the process. The same, same answer on my side, which is if the president goes for his home run pick rather than his compromise pick with the Senate, he can tee that up for the House. And my same answer, your same answer, which is if he, if he says in his nomination speech, I'm doing this to cut the House out of the process, putting aside QQD and all that kind of stuff, that would seem problematic. I think these hypotheticals highlight why it's important whether the action agency has the authority at all. And Judge Capsos' hypothetical, the president is still acting within his lawful authority. To nominate or to veto legislation. But, you know, I mean, if he didn't have that authority at all and the Congress was asking him to do something, he didn't have the authority to do, that would make the problem worse. I do think that's a division. That's why that. And the only thing I would say is, I think that even when you're trying to figure out whether the action agency has the authority on the front end, you would read whatever their authority otherwise was in the light of the various other parts of the process. And if there was some ambiguous authority that the agency was saying, oh, this gives us the authority to do it all on the front end. I would say the structure of the statute gives you a reason to construe that narrowly to make it kind of harmonious with the ESA. But I see my time is up. So thank you. Anything else, Judge Rao? No, thank you. Did you just notice that? Just now. We don't always enforce. Thank you. Ms. Ingalls, we'll hear from you. Good morning. I'm Summer Ingalls here for the Federal Appellees. With me at counsel table for the Intervenors Appellees is Kristen Monsville. The Federal Appellees ask the court to dismiss this appeal as moot or otherwise to affirm on the merits. And I'd like to- How is the challenge to phase one, the final rule, moot? The rule is in effect. It imposes tangible economic harm on the regulated industry and they're here through their trademark sign. Understood. Well, our argument as to the rule is that the act has overtaken any challenge plaintiffs might have asserted as to the rule. We maintain that the challenge is forfeited on appeal. But the act says that the rule is sufficient to put authorization of the fisheries in full compliance with the MMPA and the CSA. And we read that to imply that if the rule is sufficient to put these fisheries in compliance with these two statutes, then the rule could not possibly be inconsistent with those two statutes itself. And so- That's a merits argument. It's a merits argument in the sense that the Congress has said that the rule complies with the merits. But for present purposes, our argument is that Congress has acted and removed any ability to put forward a judgment as to the merits of the rule. So Congress has deemed the rule sufficient to put these fisheries in compliance and therefore, by implication, has said that the rule itself complies with the ESA. Taking a broader view of the statute- Can I- just one question on that is whether it's merits or lewdness, why would you read sufficient to mean necessary? It's conceivably generally sufficient does not mean necessary, but here we think it does. And that brings me to my second point. The rule in the act that Congress has promulgated here is the offer to develop. It's the linchpin of the- of Congress's determination that the authorization is in full compliance. So it must remain. If the rule were to be remanded and the agency were to be tasked with preparing some different rule, there would be no way to say whether Indian authorization of the fisheries is still in compliance with those two relevant statutes. And although I realize that the first statement is only light support, Inga King said when he introduced this, that the provision is a compromise. Negotiated between various people interested in this issue and the body that leaves in place all of those protective measures. And when he said protectors, protective measures, he was referring to the rule. So whether it's cautioning movements or a directed result, the point is that the act was overtaken any challenge the plaintiffs might have asserted. That's the merits of the rule. Again, not only- Let me just take a question to clarify something. I'm not sure I got that. You're saying once the statute is passed, deeming the rule sufficient, it precluded, it precludes a challenge on the merits because that if successful would leave, no one would know whether they're in compliance. Is that what you're saying? The argument is yes, the statute does say sufficient, but if the rule were to be remanded for promulgation of something less stringent, perhaps. We would be essentially left without the legislation. There's no way to know whether the authorization would be in full compliance if the rule has been taken out. That's why I say that the rule is the linchpin or the keystone. Okay, well, there wouldn't be a way to know except that, except through litigation. That could be resolved. If the remand results in a certain portion of the rule being invalidated. So the question is, well, is it still sufficient? The agency, the government can take a view on that and say, well, it's not anymore. And, and, and precipitate a lawsuit. That is possible. We would certainly be back in court. But I think that my broader point is that if we were litigating about whether a new rule complied with ESA or the MMPA, it would essentially be setting aside what Congress has already said here. We would be back to square one, looking at compliance with the ESA and the MMPA. And when Congress passed this statute, it put a pause in place for the next six years and instructed the agency with a significant amount of funding to spend its resources working with other parties, states, regulated parties to, to, to generate new technologies that would be incorporated into a new rule in 2020. So just to follow up on what you're saying then, that the court were to say, we're not going to vacate. The rule has been deemed sufficient, but we're going to entertain the, the appellant's claim that parts of the rule are arbitrary in their formation. Basically, they're seeking a declaration to that effect. That that would also be precluded? I think it would be precluded by the, the, the language of the act and the purpose of the statute, which was to put a pause, put a pause here. But to, to hit it slightly, it brings this argument is that the rule is invalid because it relies on the biological opinion. Therefore closed again, because as we've explained, the authorization of the fisheries after the rule is in full compliance with the Endangered Species Act. The relevant analysis for compliance with the Endangered Species Act is the biological opinion. And so we disagree with plaintiff's assertion that the rule relies on the biop. That's factually incorrect. But if we were to accept that premise, it would still fail under the language of the statute. So let's say, let's say, assume for the moment that the Appropriations Act makes the rule impregnable. And the appellants tell us, well, that's beside the point. There's an ongoing process, which is burdening us based on the biological opinion. I am struggling to think what that might possibly be. And not to be facetious, but they can identify no regulatory actions coming from the biological opinion. Well, they talked about being engaged in mandatory meetings about achieving the necessary take reduction. And meanwhile, suffering under the uncertainty about whether, what their members are going to do about investments in terms of new equipment, so. Yes, but those actions, the meetings come from the process that is associated with promulgation of a new rule. It's not supposed to be burdensome. It enables them to provide their views to the regulating agency. And that process comes not from the biological opinion. It comes from the Marine Mammal Protection Act. But for present purposes, this no jeopardy biological opinion has no regulatory effect. It has no harm on the plaintiffs. And they challenged in this case because they've asserted that the conservation framework somehow sprung from the biological opinion. But as we've explained in our declaration, the conservation framework or the phases that remain, phases three and four, the phases that affect the relevant fisheries are not being pursued. We make this very clear in the declarations, services, phases three and four. Right. But the biological opinion is the entire basis for phase one. Biological opinion said here the four things we need to do in order to obtain compliance. I respectfully disagree. The phase one rule was promulgated, as we've explained in our brief on pages 10 through 16. It's promulgated under the MMPA, Marine Mammal Protection Act process. And that process was ongoing. It was initiated in 2017. And it's a separate regulatory process. So it had its own Endangered Species Act consultation. That's at pages A378 to 79 of the record. So this process was ongoing. It's entirely separate from the consultation that was associated or the consultation undertaken to evaluate whether the continued authorization of the fisheries would likely jeopardize the species. And so, yes, biological opinion does reference phase one, the conservation framework, but that's the take reduction plan amendment rule. It was already in place or the production of that rule is in place. It's not relying on the biological opinion. The biological opinion might be dependent on phase one in the sense that it analyzes the fisheries as they would proceed under that rule. But phase one is not dependent on the biological opinion. Your defense of the rule in your briefing seems to rest entirely on biological opinion and not on some independent ground or through MMPA process. We haven't advanced a specific argument in our rule or in our briefing as to the rule because we didn't see that they had made a separate argument specific to the rule. Challenge to the rule? Correct. Count three of their complaint. Challenges the challenges phase one based on perceived flaws in the biological opinion. And Judge Boasberg's opinion saw it exactly that way. He said the biological opinion is fine and therefore the phase one rule that flows from the biological opinion is fine. So that's the way the issue was teed up. I confess that our brief could have been more specific in our explanation of the separate regulatory processes for these two actions. But again, at pages 10 to 16 of our brief, we explain that they are indeed separate. And I'm happy to proceed to our discussion about the validity of the buyout. But again, the validity of the buyout doesn't affect the validity of the rule. Ms. Engels, can you give us your best statutory argument for why the rule and the biological opinion are not contrary to law? Answering the contrary to law argument that appellants have made here. Because most of the briefing really focuses on arbitrary and capricious and defending the actions as reasonable. Correct. Because the contrary to law argument that plaintiffs have presented, the idea that the biological opinion is somehow inconsistent with section seven, completely attacked the straw man, which is really not what the agency produced. I'm not able to defend whether it would have been lawful for the agency to set aside the best available science and proceed based on a policy because that's not what the agency did here. The relevant language in section seven is the best available science. And the standard means that the agency needs to evaluate the science and data before it and ignore superior data and must explain this approach. And that's exactly what the agency did here. What about giving the benefit of the doubt to the species here? I mean, how is that consistent with the statute? And also, how is that consistent with the 2019 rule that specifically takes that off of the table? So I'd like to, well, to answer the question about consistency with the statute, the statute was promulgated to conserve threatened species and it's established a national policy the agency should seek to conserve listed species. But again, I'm not defending any agency decision to adopt a policy that forced it to ignore the best available science in favor of some sort of freestanding presumption because that's not what the agency did here. I think this has collected a number of selective quotes from the record where the agency did say when we're dealing with data uncertainties, we used metrics representing the worst case scenario. But for example, in that very same context, I'm here speaking about pages A, 926 through 27 of the record. The agency's analysis could stand on its own without any reference to worst case scenario or benefit of the doubt. The agency said in that context that when it was preparing the population projection model, when it was dealing with data uncertainties, for example, uncertainties in the counting rates that might be in the future or unquantified benefits from conservation measures, it used the actual data. And to bring that down to more granularity, the agency explained that it used calving rates from 2010 to 2019 because that was the actual data it had. And it explained that might actually represent the worst case scenario because calving rates are expected to improve with the framework in place. Likewise, the agency didn't use unquantified benefits from conservation measures in Canada because they couldn't be quantified. But the agency said when the data produce a range, we will pick, when in selecting within the range, we pick the best for the species. And that seems, I mean, that's not a tiebreaker rule and that's not a thumb on the scale. That's a whole arm scale. There were some cases where the agency was faced with uncertainty or a range of particular values or different analytical approaches when those could all be applied to the same data set. Reasonably, yes, the agency proceeded with caution. That is entirely consistent with the Endangered Species Act. Well, how is it? Ms. Engels, you're avoiding my question about how that's consistent with the 2019 regulation that my understanding is still on the books, right? So there's a 2019 regulation that says in this process that agencies are not to use the worst case scenario or make conservative modeling assumptions. It specifically rejects the benefit of the doubt theory and it finds irrelevant the conference report that is relied on in your brief. So how is all of that consistent with the regulation that is still on the books from just a few years ago? So if your honor is referring to 84 Fed Reg pages 44, 976 and 45,000, those are comments that the agency provided or responses to comments the agency provided when it promulgated that regulation. But ultimately it said the agency, yes, it's the Endangered Species Act. We are concerned about listed species, but agency is not under an obligation to adopt the worst case scenario. It's obligated to apply the best available science. And it explained that to be data, agency knowledge, expertise, and it confirmed that the agency needs to consider actions and effects that are reasonably certain to occur. But that's exactly what the agency did here. It was relying on data and it didn't apply that approach in every instance. So for example, on page 8817 of the appendix, that's where the agency explained how it was going to allocate deaths that couldn't clearly be attributed to either entanglement or both strikes. And it said that based on the observed data, it would allocate 77% of the mortalities of unknown cause to entanglement because in that instance, the observed data was representative. But there was a study from 2021, the page study referenced on that same page that said there would have been a reason to allocate 87%. Of these unknown mortalities to entanglement. And the agency didn't proceed with that figure because it understood that the data it had that supported 77% was the best available data. So the best reading of this record is that the agency did apply the best available data. It did not just place that data with some policy or presumption. Did it reference the worst case scenario or be applying a conservative approach? Yes. But if those parts were struck from the record, the rest of the analysis would stand on its own. And I know here that the caution is consistent with the Endangered Species Act. And it's also reflective of the fact that the agency was assessing possible jeopardy to a species with only fewer than 350 individuals remaining. So in any case where it makes sense to proceed with caution or apply a conservative approach, it makes sense to do so here. But that analysis, the agency's data analysis was not driven by the status of the species. It was driven by the data and the science. And that's supported by this. So when it says it's 506, the assumptions may be considered pessimistic, but we need to give the benefit of the doubt to the species. We're supposed to disregard that? I think in that contract, the agency was talking about population projections and explaining that all of the analysis that is conducted along the way might yield a result that looked like it would be send the whale on a sharper trajectory than would actually possibly play out. You said that the agency doesn't really believe its own projections. We utilize metrics representing the worst case scenario. Consequently, model outputs very likely overestimate the likelihood of finding population. That sounds driven much more by the presumption than by the data. Especially as a better way to view that we submit is that when the agency was looking at ranges of values for the analysis and picked from the figures that were more conservative, but still supported by the data, the aggravation resulted in a more pessimistic population trajectory. Ultimately, the agency reached a no jeopardy conclusion. It wasn't producing the population trajectory figures because they had a specific regulatory effect or because it was looking for precision in the next 50 years. It was looking only to determine whether continued authorization of the fisheries would jeopardize the whale and it determined based on its analysis that it would not. If the agency were trying to measure something relevant to this and they get probability distribution, some variable, did they say, I'm not going to pick the height of the bell curve. We're going to go two standard deviations to the left because that point is more protective of the species. I think it would have to be a fact specific analysis. I mean, I understand we're talking about statistics and if the best data shows the center line is the right approach and that would be what the agency has to do. It has to justify its determination and can't say. They have to take their best shot at coming up with the best answer. Can't just say, oh, there's this broad range. So we're going to pick the end point rather than something in the heartland. It couldn't do it in every case. It has to be justified based on the record. But again, that is what the agency did here. And there are places in the record where the agency referred to using a worst case scenario. But in all of the instances, the agency explained its approach and why it was based on the data. Ultimately, the best available science standard means that the agency can't base its decision on speculation. That's not what the agency did here. And plaintiffs identify no better information that the agency overlooked. And so the story about broad policy is really an attack on the strongman. It doesn't have support in the record. The agency's charge is to figure out what's likely. Is that right? The word likely is key here? It is. So that makes it difficult for me to understand somethings that appear in the brief. And this is an example on the lines we've been discussing. The service evaluated a worst case scenario among the most likely scenarios. What does that mean? Well, our point is simply that a true worst case scenario would have allocated all entanglements to U.S. fisheries and said that it would happen in great numbers, great far into the future. That would be a true worst case scenario. What the agency did here was evaluate the available data, assess its confidence in that data, and say when there are a number of equally likely or possible outcomes, we will take the one that is more conservative or more cautious. Because our task is to ensure that jeopardy is unlikely and selecting an outcome that might understate the effects would not be consistent with that mandate. Likely just means more than 51 percent, right? More than 50 percent. Yes. So if you have a worst case scenario that is truly worst case scenario where it's extremely unlikely that the species will survive and several other intermediate steps, you're saying, well, that's really, that's just too one. But the one that says, well, there's a 60 percent chance that the species will survive. And another one that says there's a 40 percent chance that the species will survive. You're going to take the 40 percent. It would depend on whether that decision was supported by the data. But for example, here, you know, I turn back to the page 817 where we discussed the difference between entanglements and both stripes. What page number again? It was page 817 of the record. Page 17. And so in that instance, the agency had one figure that said based on a 2021 study, that it could allocate 87 percent of the unknown cause deaths to entanglements. But it also had data that showed that 77 percent of the unknown causes could be attributed to entanglements. And in that case, because it determined that the 77 percent figure had more support in the record and was more reliable, it proceeded with that figure. And so it's not true that in every case it said we will pick the most conservative figure. That may well be the problem arises if in any case it did. I haven't found a place in the record where they did that and the opponents haven't either. The 50-50 split on I guess it's mortalities, right? That's between Canada and the U.S. It seemed to be an example. Well, the agency there explained that although there were more observed entanglements that could be attributed to Canada, most observed data is not representative. Again, the whales move, lots of gear is unmarked. And so the fact that some have been found in Canada is not representative of the larger of the larger circumstance. The surveys that are being conducted in Canada are more carcass detection studies. They support a different mission. And the agency said more whales are spending more time in the United States. Yes, they're spending more. Some population is spending more time in Canada. But there are considerations on both sides of the... When it's said that whatever it is, some degree whales are spending time in the United States. Did that distinguish at all between the southeast ocean of the United States or versus the lobster, the fishery area? I'm not aware of a figure. I can't... What's the relevance of the... When they're in the southern waters, I don't see the relevance of their having been in the United States. I take your point, Your Honor. I think the way I respond is by saying that, yes, although a population is moving into Canada, it's only a small concentration of the population. About one-third in that concentration still spends about half of its time in the U.S. waters. That's on A480. This is a difficult analysis. Whatever that half is, the U.S. waters could have been discounted to reflect relevant waters. Perhaps it would have been possible to be more precise in these figures. But this is difficult. The agency is working with very limited data. Their population is limited. And the agency submitted its analysis to independent experts who did express disagreement on the best approach. Well, that's true. Limited data helps too. Could the agency, lawfully have said, non-arbitrarily have said, well, obviously, some of the time is spent outside of the fishery areas, indeed, maybe half a year. But we're not sure about how much, so we're just going to disregard that, not try to... I'm sorry, Your Honor. Could you repeat the question? So I don't understand why the absence of data is the obstacle here to making some adjustment for the fact that the whales who spend half their time in the United States do not spend all of that time in the fishery, or even in oil. Understood. And I think with these analyses, they could always be more precise. But the question is whether it was reasonable. And when the agency conferred with independent experts, they expressed disagreement on the best approach, but ultimately determined, and this is page A1992 of the appendix, that the 50-50 split was likely still a conservative estimate of residency in U.S. waters, and there was no data on which to base a different level of apportionment. Is that the point on which the peer review committee was divided? Yes, they were divided, but the ultimate conclusion, the agreement, was that there was no better way to draw the line. And so the question for present purposes is not whether the agency could have developed a more precise analysis, or whether it might not completely accurately reflect on the ground or in the water circumstances. The question is whether the agency reasonably applied and considered the data before it, and it did that. And therefore, it applied the best available. Do you have anything to say on Mr. Clement's second point? I'm happy to address it briefly. I think my primary point here is that the regulatory authority to proceed with the conservation framework and the regulations they're in comes from the Marine Animal Protection Act. The idea that moving forward to a jeopardy determination would somehow open up a variety of doors that would have helped the fishery is not accurate if the agency had reached a jeopardy determination and the fishery would have to have shut down. And although the committee procedure does exist, it grants exceptions only when the applicant can show that the action cannot be altered or modified to avoid violating section A2. And the committee concludes that no reasonable and prudent alternatives are available. And so here's the fact that the agency developed a plan to avoid jeopardy to keep this important industry open and to authorize the fisheries is a benefit. It's not something that prompted the agency to avoid or sidestep any sort of necessary analysis or benefits for the industry. Let me ask you about the statement at 45 of your brief. The relevant text, this is of 782. The relevant text says nothing about how an agency must handle uncertainties in the data. However, notice that limited source of conversions agencies may drop when they face uncertainty. The 506 in the appendix opinion, it says, as the assumptions may be considered pessimistic, but given congressional guidance on implementation of ESA, we need to give the benefit of the doubt to the species. So, and that elsewhere, that's an age 50. The agency describes that guidance as a directive. So the agency seems to be proceeding on the belief that it is compelled to do what it did. Well, or what you're saying it didn't do, give the benefit of the doubt. Although, the various places it says that, but it certainly seems to say, to think that it's compelled by the statute at one point and another, that statute doesn't give any binding view on this. Correct. And I believe that there's some tension between saying, look at what the agency said here and look at what the agency did here. But when we're talking about using the best available data, the record shows that the agency did that. And our brief explains that. You made that point. I won't say the tension. I see the tension. Ultimately, the idea that an agency might proceed conservatively in the face of unclear data, when it's producing an analysis under the Endangered Species Act, it's consistent with the act. We would never agree that that goal should trump any requirement to apply the best available data. And that's what these. By the way, if the biological opinion were set aside, wouldn't the previous biological opinion just simply take in and remain the reigning document? And I can only speculate, Your Honor, but because these are scientific analyses, I don't think the prior one could spring back into force. It would need to be updated to ensure that it reflects the best available data. This brings me to one quick point I'll make, that if the court is inclined to vacate, no party has requested vacater of the biop to date, and we'd like an opportunity to submit briefing. Also, keeping the biop, the opinion in place is important because it's something that the agency looks to when it grants permits to the fishery. And so setting aside this no jeopardy opinion, which has no harms currently, will produce harms, both for the agency and for the regulators. I'm sorry, you said the opinion is something you look to in doing what? In granting permits for the fishery. Which is ongoing. Correct. That sort of confirms Mr. Clement's point that the biop has all of these other consequences, besides arguably supporting phase one. Well, the argument that I understand our opponents make is that there are regulatory effects and harms that flow from the biological opinion. Our point is that the opinion exerts as an analysis of the fisheries, and in some limited instances, it's used to ensure that the fisheries can continue to operate. And I'd be happy to submit additional briefing. If the previous biological opinion kicked in, and so such time as the current one could be updated, correct, and so on. That one found that there was no jeopardy, right? To the right whales authorized to fish in section seven. So that would just be, if that's the relevant, if that would legally kick in, that would be the status quo. And so such time. Who? Now we know it improves. I don't mean to use this hypothetical. I'm simply don't have enough information to say whether it would, in fact, again, this time. Thank you. Good morning. Is it Monsal? Monsal. Monsal. Welcome. Good morning. May it please the court, Mr. Monsal, on behalf of intervener, appellees. I just like to briefly address one issue, and that is why the court doesn't have jurisdiction over appellant second claim, challenging the conservation. As they haven't and can't shown they're injured by it, and that's black standing the challenge. And that's because despite recognizing the critically endangered status of the North Atlantic right whale and the threat that the lobster fishery poses to the species, the agency didn't actually require any changes to the fishery in the framework itself. It has no current impact on the fishery. It simply lays out risk reduction targets for one to two future rulemakings for the fishery through 2030 and doesn't specify any particular measures. And in fact, the framework says expressly and repeatedly that there will be an evaluation period before each new phase to examine new information that the targets are subject to revision as new information becomes available based on those two evaluation phases, and that further action may not be needed. And I would direct the court's attention specifically to a 605 and a 1078 in the record where the agency says it will evaluate new information and quote, evaluate whether further action in the federal fisheries is needed, and if so, at what level. So the claims you're hearing about how the framework imposes draconian measures in the briefing and the arguments today are just simply impossible to share with the framework. Do you agree that there is a live controversy with respect to the final rule? We had challenged plaintiffs or appellants standing with respect to two claims. And insofar as that challenge is live, we can review aspects of the biological opinion to the extent we think they support or don't support the final regulation. I think that's okay. Thank you. So they don't have standing based on phase one of the, excuse me, they don't have standing to challenge the framework based on phase one. And that's for a couple of different reasons. One is you- That's just the merits argument that the rule can be justified through the Marine Mammal Statute as opposed to the ESA. Right. The record demonstrates that the agency developed that rule under the Marine Mammal Protection Act to comply with separate statutory requirements. Which is a contested question on the merits of their challenge. Correct. And I think the framework itself at 1072 to 1073, it explains how that phase one rule was developed apart from the framework and elsewhere in the record. For example, 329, it explains that it was a separate process. And moreover, I think that there are arguments against the framework aren't based on current harm from the rule itself, but speculation about future harms about what might happen in the event the agency does issue these future rules. And the rule has 98%. The rule has 10 to $20 million of compliance costs. That's going to give them standing. Right. And we haven't challenged their standing to challenge the biological opinion and the analysis leading to the final rule. Only their challenge with respect to claim two. And that's because the framework's targets for future rulemaking have no current regulatory impact and are explicitly subject to revision based on a new information. And there is also reference of the requirement to gather data or participate in team meetings. But those are requirements that are required under section 118 and other provisions of the Marine Mammal Protection Act, not the framework itself. And furthermore, in the recent Appropriations Act, the Congress mandated that the agency continue to collect more data and file written reports with Congress once a year to show its progress towards developing this new final rule in 2020. So there are claims from injury for the framework. At this point, they're purely conjectural. Yeah, but the court rejected their second claim on that. Thank you. We gave you a pretty good workout the first time. You want to keep going? I would like that, Your Honor. And I'll try to be brief. And unless you want to take a recess first, but I'll go. I want to let you sit down for a minute. Okay. Mr. Coleman. Just want to make a few points, quick points in rebuttal. I mean, first of all, I think it's worth underscoring that the argument that the final rule did not rely on the file is not just a merits argument. It is a forfeited merits argument. And this whole case proceeded on the assumption that all of this was intertwined. That's a very logical assumption. The conservation framework that's evaluated in the biop includes the final rule. The final rule was issued after the biop, whether or not it expressly refers to it, it uses the same data and the same flawed data, which is why Judge Boasberg and all the parties until the Appropriations Act and the government had an incentive to try to disentangle them, proceeded on the assumption that was all one in the same. So that argument is merits argument in fourth. One, just at the risk of being pedantic to point out Freudian slip on the government. When they came up here and talked about the statutory language, their statutory shorthand was the best available science. But the statutory language available, sorry, best available science. But the statutory language is the best available scientific and commercial data. And the court, the Supreme Court unanimously invented against fear, underscored that that language was added to this particular provision after TVA Hill to impose a modicum of cost benefit analysis into the system. So I think, although maybe it's Freudian slip, I think it is an important distinction. And lastly, just to underscore the arm on the scale and just to go back to A814 and that chart and the reasoning of the agency, just to give you another illustration of this was not, as you said, a thumb, but an arm on the scale. If you look at the data in the chart and you keep in mind that the reason we're here is because of the unusual mortality event in 2017, the best available scientific data, if you ask me, is that in 2016, 2017, and 2018, every single documented entanglement was a Canadian one. It wasn't 80 to 20%. For those three years, it was 100% to zero. And yet why was that data completely ignored? It was because using a different data set provides the benefit of the doubt of the species and a more conservative estimate of right-wing entanglement. So right there, it's not just breaking the tie. It's completely disregarding a whole set of data based on that presumption, which infected the entire data. Thank you. Thank you, counsel. The case is submitted.
judges: Katsas, Rao, Ginsburg